THOMAS V. GIRARDI – BAR NO. 36603
J. PAUL SIZEMORE – BAR NO. 254981
V. ANDRE SHERMAN – BAR NO. 198684
JENNIFER A. LENZE – BAR NO. 246858
GIRARDI | KEESE
1126 Wilshire Boulevard
Los Angeles, California 90017
Telephone: (213) 977-0211
Facsimile: (213) 481-1554

Attorneys for Plaintiffs filing
E-filing

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

(SAN FRANCISCO DIVISION)

| | |
|---|---|
| IN RE: BEXTRA AND CELEBREX MARKETING SALES PRACTICES AND PRODUCT LIABILITY LITIGATION | MDL No. 1699 **CRB** |
| JAMES GRAHAM, individually, BRUCE WORTHINGTON, individually, | Case No. _____ |
| Plaintiffs, | **CIVIL COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| PFIZER, INC., PHARMACIA CORPORATION, and G.D. SEARLE LLC, (FKA G.D. SEARLE & CO.), and DOES 1 through 100, | |
| Defendants. | |

JAMES GRAHAM, individually, BRUCE WORTHINGTON, individually,

hereinafter collectively referred to as "Plaintiffs", by and through their undersigned

counsel, bring this action for damages against Defendants PFIZER, INC.,

PHARMACIA CORPORATION, and G.D. SEARLE LLC, (FKA G.D. SEARLE

& CO.), and DOES 1 through 100 (hereafter "Defendants") for damages arising

from Defendants' design, manufacture, sale, testing, marketing, advertising,

promotion, and/or distribution of the unsafe prescription anti-inflammatory drugs Celebcoxib, trade name CELEBREX® ("CELEBREX").

## PARTIES

## PLAINTIFFS

## CELEBREX PARTIES

1.     Plaintiff JAMES GRAHAM, individually, was at all relevant times, an adult resident citizen of the State of Indiana and a resident of Knox County, was prescribed CELEBREX and was severely injured as a result.

2.     Plaintiff BRUCE WORTHINGTON, individually, was at all relevant times, an adult resident citizen of the State of California and a resident of Imperial County, was prescribed CELEBREX and was severely injured as a result.

3.     The Plaintiffs identified in paragraph numbers 1-2 are hereinafter collectively referred to as the "CELEBREX Plaintiffs." Each of the aforementioned CELEBREX Plaintiffs was prescribed and ingested CELEBREX. Additionally, the CELEBREX Plaintiffs sustained serious injuries caused by ingesting CELEBREX.

## DEFENDANTS

4.     Defendant PFIZER, INC. ("PFIZER") is a Delaware corporation with its principal place of business in New York, New York. On July 16, 2002 PFIZER announced its proposed acquisition of PHARMACIA CORPORATION ('PHARMACIA"). On April 16, 2003, PFIZER completed its $60 billion acquisition of PHARMACIA.  As a wholly-owned subsidiary of PFIZER, PHARMACIA acted in all aspects as PFIZER's agent and alter ego.  At all relevant times, PFIZER and/or its predecessors in interest were engaged in the business of designing, testing, manufacturing, packaging, marketing, distributing, promoting, and selling the drug Celecoxib, under the trade name CELEBREX, and the drug Valdecoxib, under the trade name BEXTRA in California and throughout the United States.

5.     Defendant G.D. SEARLE LLC, (FKA G.D. SEARLE & CO.) ("SEARLE") is a Delaware corporation with its principal place of business in

- 2 -                                                    COMPLAINT

1  Illinois. In April 2000 SEARLE was acquired by PHARMACIA, and became a
2  wholly-owned subsidiary of PHARMACIA. At the time of PFIZER's acquisition
3  of PHARMACIA, SEARLE was a wholly-owned subsidiary of PHARMACIA,
4  acting as its agent and alter ego in all matters alleged in this Complaint, and is now
5  a wholly-owned subsidiary of PFIZER. At all relevant times, SEARLE has been
6  engaged in the business of designing, testing, manufacturing, packaging, marketing,
7  distributing, promoting, and selling the drug Celecoxib, under the trade name
8  CELEBREX, and the drug Valdecoxib, under the trade name BEXTRA, in
9  Connecticut, Texas, Utah, Mississippi, Missouri, New York, and California and
10  throughout the United States.

11      6.     Defendant PHARMACIA is a Delaware corporation with its principal
12  place of business in New Jersey. PHARMACIA was created in April 2000 through
13  the merger of Pharmacia & Upjohn with Monsanto Company and its G.D. SEARLE
14  unit. PHARMACIA is now a wholly-owned subsidiary of PFIZER. At all relevant
15  times, PHARMACIA, and its predecessors in interest have been engaged in the
16  business of designing, testing, manufacturing, packaging, marketing, distributing,
17  promoting, and selling the drug Celecoxib, under the trade name CELEBREX, and
18  the drug Valdecoxib, under the trade name BEXTRA, in Connecticut, Texas, Utah,
19  Mississippi, Missouri, New York, and California and throughout the United States.

19      7.     Celecoxib was developed in 1998 by SEARLE and marketed jointly
20  by SEARLE and PFIZER under the brand name CELEBREX. SEARLE was
21  acquired by PHARMACIA, which was then acquired by PFIZER, in part so that
22  PFIZER could take full control of CELEBREX.

23      8.     True names and capacities, whether individual, corporate, associate, or
24  otherwise, of Defendants named herein as DOES 1 through 100, and each of them
25  are unknown to Plaintiffs, who therefore sue said Defendants by such fictitious
26  names.

27      9.     Plaintiffs will ask leave to amend this Complaint to state said
28  Defendants' true identities and capacities when the same have been ascertained.

-3-                                    COMPLAINT

10.     Plaintiffs are informed and believe and based thereupon allege that each of the Defendants designated herein as DOE took part in and participated with the Defendants in all matters referred to herein and was in some manner responsible for the injuries and losses suffered by Plaintiffs.

11.     At all times relevant to this action, Defendants intentionally, recklessly and/or negligently concealed, suppressed, omitted, and misrepresented the risks, dangers, defects, and disadvantages of CELEBREX and BEXTRA, and advertised, promoted, marketed, sold and distributed CELEBREX and/or BEXTRA as safe prescription medications when, in fact, Defendants had reason to know, and did know, that CELEBREX and BEXTRA were not safe for their intended purposes, for the patients for whom they were prescribed, and for whom they were sold; and that CELEBREX and BEXTRA caused serious medical problems, and in certain patients, catastrophic injuries and deaths.

12.     In engaging in the conduct alleged herein, each Defendant acted as the agent for each of the other Defendants, or those Defendants' predecessors in interest.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C.A. § 1332 (diversity jurisdiction). The amount in controversy exceeds $75,000.00 and there is complete diversity of citizenship between Plaintiffs and Defendants.

14.     Venue is proper in this District pursuant to 28 U.S.C.A. § 1391. Defendants marketed, advertised and distributed the dangerous product in this district, thereby receiving substantial financial benefit and profits from sales of the dangerous product in this district, and reside in this district under 28 U.S.C.A. § 1391(c), such that venue is proper.

15.     At all relevant times herein, Defendants were in the business of designing, manufacturing, marketing, developing, testing, labeling, promoting, distributing, warranting and selling their products, CELEBREX and BEXTRA.

- 4 -                                                   COMPLAINT

1   Defendants at all times relevant hereto designed, developed, manufactured,

2   promoted, marketed, distributed, tested, warranted and sold in interstate commerce

3   (including Connecticut, Texas, Utah, Mississippi, Missouri, New York, and

4   California) the aforementioned prescription drug. Defendants do substantial

5   business in the State of California and within this District, advertise in this district,

6   receive substantial compensation and profits from sales of CELEBREX and

7   BEXTRA in this District, and made material omissions and misrepresentations and

8   breaches of warranties in this District so as to subject them to *in personam*

9   jurisdiction in this District. In engaging in the conduct alleged herein, each

10  Defendant acted as the agent for each of the other Defendants or those Defendant's

11  predecessors in interest.

## INTERDISTRICT ASSIGNMENT

12

13  16.    Assignment to the Northern District of California, San Francisco

Division, is proper pursuant to MDL-1699, Pretrial Order No. 2 dated December

14

15  13, 2005, as this action is related to *In Re: Bextra and CELEBREX Marketing Sales*

*Prac. and Pro. Liab. Lit.*, MDL-1699, assigned to the Honorable Charles R. Breyer

16

17  by the Judicial Panel on Multidistrict Litigation on September 6, 2005.

18  ## FACTUAL BACKGROUND

## OVERVIEW OF BEXTRA AND CELEBREX

19

20  17.    BEXTRA (Valdecoxib) and CELEBREX (Celecoxib) are

21  pharmaceutical treatments for musculoskeletal joint pain associated with

22  osteoarthritis and rheumatoid arthritis among other maladies. Defendants Searle,

Pharmacia, Monsanto and Pfizer did manufacture, design, package, market and

23

24  distribute these drugs. Defendants Searle, Pharmacia and/or Pfizer (hereinafter

"Defendants") encouraged the use of these drugs in improper customers,

25

26  misrepresented the safety and effectiveness of these drugs and concealed or

understated their dangerous side effects.

27

28  18.    These Defendants aggressively marketed these drugs directly to the

consuming public, although only available through prescription, through the use of

- 5 -                                           COMPLAINT

various marketing mediums, including, but not limited to, print and television advertisements. These Defendants did this to increase sales and profits.

19. The market for such pain relieving drugs is huge. BEXTRA was originally indicated for osteoarthritis, adult rheumatoid arthritis and pain. Approximately twenty million Americans suffer from osteoarthritis alone, while an additional two million suffer from rheumatoid arthritis.[1]

20. Defendants engaged in extensive advertising directed to consumer. For the period 2003 through 2004, BEXTRA brought in approximately $2 billion in revenue.[2]

21. At all times relevant hereto, the Defendants actually knew of the defective nature of their product as herein set forth, yet continued to design, manufacture, market, distribute and sell their products so as to maximize sales and profits at the expense of the general public's health and safety in conscious disregard of the foreseeable harm caused by these products. Defendants' conduct exhibits such an entire want of care as to establish that their actions were a result of fraud, ill will, recklessness, gross negligence or willful and intentional disregard to Plaintiffs' rights, and hence punitive damages are appropriate.

22. The damages sought herein are the direct and proximate result of Defendants' wrongful conduct in connection with designing, testing, inspecting, manufacturing, assembling, developing, labeling, sterilizing, licensing, marketing, advertising, promoting, selling, packaging, supplying and/or distributing the prescription drugs BEXTRA (Valdecoxib) and/or CELEBREX (Celecoxib).

23. At all times relevant hereto, Defendants were engaged in the business of designing, testing, inspecting, manufacturing, assembling, developing, labeling, sterilizing, licensing, marketing, advertising, promoting, selling, packaging, supplying and/or distributing the pharmaceutical drugs BEXTRA (Valdecoxib) and CELEBREX (Celecoxib) throughout the United States.

---

[1] Statistics are from Centers for Disease Control and Prevention (CDC), National Institute of Arthritis and Musculoskeletal and Skin Diseases, part of the National Institutes of Health, and the Arthritis Foundation.

[2] Pfizer Annual Report to Shareholders, 2004.

- 6 -                                                                          COMPLAINT

· 1

24.    Had Defendants properly disclosed the risks associated with using

2    BEXTRA (Valdecoxib) and CELEBREX (Celecoxib), Plaintiffs would not have

3    taken BEXTRA and/or CELEBREX (Celecoxib) for treatment of pain associated

4    with Plaintiffs' injuries

5

6    ## FACTUAL ALLEGATIONS REGARDING CELEBREX

7    ## Facts Regarding Celebrex's Safety And Defendants' Knowledge Thereof

8    25.    The potential for cardiovascular risk of selective COX-2 inhibitors

9    was known to Defendants long before the FDA granted market approval in

10    December 1998. By 1997, and prior to the submission of the New Drug

11    Application (the "NDA") for CELEBREX, Defendants were aware that, by

12    selectively inhibiting only the COX-2 enzyme, CELEBREX altered the homeostatic

13    balance between prostacylcin synthesis and thromboxane and thereby increased the

14    prothrombotic effects of the drugs, causing blood clots to form in those who

15    ingested it.[3]

16    26.    Pharmacologist Dr. Garrett Fitzgerald of the University of

17    Pennsylvania reported in an editorial published in *The New England Journal of*

18    *Medicine* on October 21, 2004, that contemporaneous with Defendants' launch it

19    was known that selective COX-2 inhibitors, such as CELEBREX, suppressed the

20    formation of prostaglandin I-2 in healthy volunteers, inhibited platelet aggregation

21    in vitro, and may predispose patients to myocardial infarction or thrombotic stroke.[4]

21    27.    Early FDA updates in March and April of 1999 similarly

22    acknowledged this known risk, but noted, based upon PFIZER's representations,

23    that CELEBREX "does not affect platelet aggregation (clumping), an important

24    part of the blood clotting process."[5]

25

26

27    [3] *See* Topol, E.J., *et al.*, "*Risk of Cardiovascular Events Associated with Selective Cox-2 Inhibitors*," JAMA, August 22, 2001 at 954.

28    [4] Fitzgerald, G.A., Patrono C., "*The Coxibs, Selective Inhibitors of Cyclooxygenase-2*," N Engl J Med 2001;345:433-442.
[5] *See* FDA Updates, "*New Arthritis Drug May Have Fewer Side Effects*," FDA Consumer March-April 1999.

COMPLAINT

· 1

2

3

4

5

6

28.    Based on the studies performed on CELEBREX, other COX-2 inhibitors, and basic research on this type of selective inhibitor which had been widely conducted, Defendants knew when CELEBREX was being developed and tested that selective COX-2 inhibitors posed serious cardiovascular risks for anyone who took them, and presented a specific additional threat to anyone with existing heart disease or cardiovascular risk factors.

7

8

9

10

11

12

29.    Despite years of studies on selective COX-2 inhibitors, as well as the disturbing new studies specifically analyzing the risks of CELEBREX, Defendants failed to take any action to protect the health and welfare of patients, opting instead to continue promoting the drug for sale even after the FDA's Drug Safety and Risk Management Advisory Committee and Arthritis Drug Advisory Committee meetings.

13

14

## Celebrex and Cox-2 Studies Did Not Show Celebrex to be Safe

## Celebrex Long-Term Arthritis Safety Study (CLASS)

15

16

17

18

19

30.    In September 1998, PHARMACIA sponsored an allegedly independent CELEBREX Long-Term Arthritis Safety Study ("CLASS"). The multicenter, double-blind, parallel group study sought to compare the incidence of clinically significant upper gastrointestinal events between CELEBREX 400 mg BID and Ibuprofen 800 mg.[6]

20

21

22

23

31.    On September 13, 2000, Defendants released the results of the CLASS study in the *Journal of American Medicine.*[7]  Researchers enthusiastically reported a "lower incidence of symptomatic ulcers and ulcer complications combined, as well as other clinically supported toxic effects, compared with NSAIDs at standard doses."

24

25

26

32.    Although Defendants touted the CLASS study as the primary evidence to support its theory that CELEBREX was safer for consumers who could not

27

28

[6] (CLASS data is found in NDA 20-998/S-009 submitted to the FDA by SEARLE on June 12, 2000. CLASS was submitted to the FDA on June 12, 2000 and reviewed by James Witter, M.D., Ph.D. (FDA Medical Officer) on September 20, 2000.)

[7] Silverstein, F.E., *et al.*, "*Gastrointestinal Toxicity with Celecoxib vs. Nonsteroidal Anti-inflammatory Drugs for Osteoarthritis and Rheumatoid Arthritis: The CLASS Study: A Randomized Controlled Trial,*" 284 JAMA 1247 (2000).

- 8 -                                                      COMPLAINT

tolerate traditional NSAIDs in their gastrointestinal system, Defendants intentionally, recklessly and/or negligently concealed, suppressed, omitted, and misrepresented the results, risks and defects of the CLASS study.  Among other things, Defendants failed to release the study's complete twelve month results releasing only the first six months of trials, reported biased and misleading results, limited conclusions to upper gastrointestinal events despite other known risks factors, and understated known cardiovascular risks.

33.    Despite Defendants' favorable CLASS Study conclusions, no other reviewing or administrative body was able to substantiate those findings.   The FDA Medical Officer Review of the CLASS data found CELEBREX to be no more efficacious than other traditional NSAIDS comparators.[8]   According to the FDA's review of the CLASS data: "Celecoxib did not demonstrate any statistical superiority to NSAIDs (pooled) or either comparator (diclofenac and ibuprofen) with regards to the primary safety endpoint of CSUGIE (Clinically Significant Upper Gastrointestinal Adverse Events) at any point in the trial although there were trends that favored celecoxib."[9]

34.    The FDA Arthritis Advisory Committee similarly found no "clinically meaningful" safety advantage of CELEBREX over older NSAIDs.[10]  The CLASS Study failed to demonstrate a superior safety record over ibuprofen or pooled NSAID data.  Based on this information, the Committee advised that further studies be done to assess the risk of COX-2 drugs and NSAIDS when taken with aspirin.

35.    In a June 2002 editorial, the *British Medical Journal* chastised the Study's "misleading" and "seriously biased" nature; noting that the complete results "clearly contradict[ed] the published conclusions," and warning against the dangers of "overoptimistic," "short-term" data and "post hoc changes to the protocol."[11]

---

[8] *See generally*, FDA Medical Officer Review, NDA 20-998/S-009 submitted to the FDA by SEARLE on June 12, 2000.
[9] FDA CLASS Review.
[10] FDA CDER Arthritis Advisory Committee, February 7th and 8th, 2001, Gaithersburg, Maryland.
[11] Juni, Peter, *et. at., "Are Selective COX 2 Inhibitors Superior To Traditional Non Steroidal Anti-Inflammatory Drugs?"* BMJ 2002;324:1287-1288.

1    Most noticeably, the CLASS study considered only six months of data despite the
2    fact that researchers at that point had 12 months of data that, when analyzed as a
3    whole, showed no significant difference.  Instead of releasing the complete 12-
4    month results from CLASS, PFIZER relied on and published only the first six
5    months of data.[12]  The results of the completed study revealed the real truth:
6    CELEBREX offered no gastrointestinal (GI) benefit.  Almost all ulcer-related
7    complications that had occurred during the second half of the CLASS trials were in
8    users of CELEBEX.  These results clearly contradict the published CLASS
9    conclusions.

10        36.    Editors of the Journal of the American Medical Association (JAMA)
11    and other medical experts were reportedly "flabbergasted" when they realized they
12    had been "duped" by only being provided with the first six months of CLASS data.[13]
13    The *Washington Post* reported JAMA editors noting: "When all of the data were
14    considered, most of CELEBREX's apparent [GI] safety advantage disappeared."

15        37.    Institutional bias also appeared to play a role in the Study's biased
16    conclusions. According to the *Washington Post*, all sixteen CLASS authors were
17    either employees of PHARMACIA or paid consultants of the company.   Moreover,
18    at least one author, Dr. M. Michael Wolfe, a gastroenterologist from Boston
19    University, admits he was duped by PHARMACIA.  In the summer of 2000, *The*
20    *Journal of the American Medical Association* asked Wolfe to participate in the "six-
21    month" trial.  Wolfe found the study, tracking 8,000 patients over a six-month
22    period, persuasive, and penned a favorable review, which helped to drive up
23    CELEBREX sales.  It was not until early the next year, while serving on the FDA's
24    Arthritis Advisory Committee, that Wolfe learned the study had run for one year,
25    not six months, as the company had originally led both Wolfe and the *Journal* to

26
27
28    [12] JAMA 2000, 48:1455-1460.

[13] Okie, S., *"Missing data on Celebrex: Full study altered picture of drug,"* Washington Post 2001 Aug 5;Sect A:11.

COMPLAINT

· 1

2

believe.[14] Here again, when the complete data was considered, most of CELEBREX advantages disappeared.

3

4

5

6

7

8

9

10

11

12

38. Defendants also limited conclusions of the CLASS study to upper gastrointestinal events, despite other known risks factors, and understated known cardiovascular risks. A metastudy by the Cleveland Clinic published in the Journal of the American Medical Association analyzed data from two major studies, including CLASS, funded by the drug companies and two smaller ones—all for cardiovascular risks.[15] The metastudy found that PHARMACIA failed to identify and study cardiovascular risks for their products. The annualized heart attack rates for patients taking Vioxx or Celebrex, the researchers found, were "significantly higher" than those in a group taking placebos. "The available data raise a cautionary flag about the risk of cardiovascular events with Cox-2 inhibitors," they concluded.

13

14

15

16

17

18

19

20

21

39. "A total of 36 deaths occurred during the [CLASS] study or during post study follow-up: 19 in the celecoxib group, 9 in the diclofenac group and 8 in the ibuprofen group. . . . Most deaths were cardiovascular in nature."[16] The increased number of adverse cardiovascular events in the CELEBREX group was not surprising, as they were also revealed in the original New Drug Application (NDA) submitted for CELEBREX. "In the original NDA, myocardial infarction was noted to occur at a higher rate in celecoxib-treated as compared to placebo treated patients. In the long term trial (Trial 024) that was included in the NDA submission, the predominate (>90%) cause of death for patients taking celecoxib at any dose was cardiovascular."[17]

22

23

24

40. Public Citizen, a public watchdog organization, also reviewed the CLASS data in its entirety. A complete review reveals the combined anginal adverse events were 1.4% in the CELEBREX group versus 1.0% in either NSAID

25

26

[14] *Id.*

27

[15] Debabrata Mukherjee, *et al.*, "*Risk of Cardiovascular Events Associated with Selective Cox-2 Inhibitors*," 286 JAMA 954 (2001).

28

[16] FDA CLASS Review at 54.

[17] FDA CLASS Review at 78.

- 11 -                                              COMPLAINT

· 1

2

group. Specifically, the rate of heart attack in the CELEBREX was double that of the other two NSAIDs, 0.2% vs. 0.1%, respectively.

3

4

5

6

7

8

9

10

11

41.    Eric Topol of the Clevant Clinic reached a similar conclusion, noting that the CLASS trail MI rate was 1.6% in CELEBREX group (at a dosage of 400 mg twice a day) and 1.2% in the ibuprofen group for the 1739 patients taking low-dose aspirin.  Topol noted that this numerical excess, albeit not statistically signification, was also found in the 6229 patients not taking aspirin in the trial.[18] Based on this data, Topol and his colleagues concluded: "It is mandatory to conduct a trial specifically assessing cardiovascular morbidity."[19]  Unfortunately, no such trials were ever initiated, delaying the official warnings of CELEBREX and jeopardizing countless lives in the process.

12

13

14

15

16

17

18

42.    The CLASS data proves that PFIZER knew that its first generation COX-2 inhibitor, CELEBREX, caused a disproportionately and statistically significant high number of adverse cardiovascular events before it was introduced to the market in January 1999.  According to Public Citizen, after CLASS, the FDA recommended a trial to specifically assess the cardiovascular risks of COX-2 inhibitors.  The Adenoma Prevention with Celecoxib (APC) trial was intended to be this placebo-controlled trial of CELEBREX.

**APC Trial**

19

20

21

22

23

24

25

26

43.    In early 2000, the National Cancer Institute (NCI), in collaboration with SEARLE and PFIZER, initiated the Adenoma Prevention with Celecoxib (APC) trial, a randomized, double-blind, placebo-controlled study to discover the efficacy of CELEBREX in preventing the growth of pre-cancerous colon polyps.[20] The trial involved 2026 patients across the country with randomization to one of three groups: (1) placebo; (2) 200 mg CELEBREX twice daily; and (3) 400 mg CELEBREX twice daily.  The patients, each of whom had an adenomatous polyp removed before enrollment, were followed up for a mean of 33 months while taking

27

28

[18] Eric J. Topol, *"Arthritis Medicines and Cardiovascular Events – House of Coxibs,"* JAMA 293:366.

[19] *Id.*

[20] N.ENG. J. MED. 352;11 at 1072.

- 12 -

· 1    the study drug, with the primary objective of limiting the development of colorectal

2    cancer.

3    44.    On December 17, 2004, the National Cancer Institute suspended the

4    use of CELEBREX for all participants in the APC trial due to "significant excess of

5    cardiovascular death, myocardial infarction (MI) and stroke."[21] Analysis by an

6    independent Data Safety Monitoring Board (DSMB) showed a two to three fold

7    increased risk of major fatal and non-fatal cardiovascular events for participants

8    taking the drug compared to those on a placebo with a secondary dose-response

9    effect.

10    45.    The absolute excess of major cardiovascular events of 13/1000 patients

11    at the 800 mg dose (400 mg 2x day) was strikingly similar to the results of trials

12    with rofecoxib and valdecoxib, both selective NSAID COX-2 inhibitors removed

13    for the market for their significant cardiovascular risks.[22]

14    46.    The FDA reported similar results, noting:

15    47.    In the National Cancer Institute's Adenoma Prevention with Celecoxib

16    (APC) trial in patients at risk for recurrent colon polyps, a 2-3 fold increased risk of

17    serious adverse CV events was seen for CELEBREX compared to placebo after a

18    mean duration of treatment of 33 months. There appeared to be a dose response

19    relationship, with a hazard ratio of 2.5 for CELEBREX 200 mg twice daily and 3.4

20    CELEBREX 400 mg twice daily for the composite endpoint of death from CV

21    causes, myocardial infarction (MI), or stroke.

21    48.    April 7, 2005 FDA Alert:

22    www.fda.gov/cder/drug/infopage/celebrex/celebrex-hcp.htm.

23    49.    The dosage noted in the study is itself important for two reasons: first,

24    there appears to be an association between dosage and the increase in adverse

25    cardiovascular events; second, most patients increase dosage. PFIZER knew

26    patients were increasing their dosages as noted in the CLASS Study: "Interestingly

27

28    [21] Eric J. Topol, "*Arthritis Medicines and Cardiovascular Events – House of Coxibs,*" JAMA 293:366.
     [22] Eric J. Topol, "*Arthritis Medicines and Cardiovascular Events – House of Coxibs,*" JAMA 293:366.

- 13 -                                                    COMPLAINT

1  ... up to 70% of patients increased their dose for celecoxib."[23] Thus, PFIZER was

2  aware of "dosage creep."

3

4  ## Other CELEBREX Trials

5  50.    Several other CELEBREX trials also gave Defendants insight into the

6  cardiovascular risks presented by CELEBREX.  The Prevention of Spontaneous

7  Adenomatous Polyps (PreSAP) trial identified the death rate from cardiovascular

8  causes (heart attack, stroke, heart failure, angina, or need for CV procedure) as

9  3.6% with CELEBREX as compared to 2.7% for placebo.

10  51.    Public Citizen also reviewed the results of Study IQ IQ5-97-02-001

11  which reflected "the combined rate of all serious cardiovascular adverse events in

12  patients getting a placebo was 2.1% but was greatly increased in those getting

13  celecoxib to 7.7%, a 3.6 fold increase in CV risk in those people taking celecoxib.

14  (p=0.03)."[24]    According to Dr. Sidney Wolfe, "The study revealed a significantly

15  increased rate (3.6-fold) of serious CV adverse events and more than a doubling in

16  the rate of CV deaths in people using celecoxib compared to those using placebo."[25]

## Cox-2 Studies: VIGOR and APPROVe

17  52.    PFIZER also had access to other data which indicated a cardiovascular

18  risk with its drugs.  Specifically, PFIZER had knowledge of two studies conducted

19  by Merck related to its Cox-2 inhibitor Vioxx – Vioxx Gastrointestinal Outcomes

20  Research (VIGOR) and Adenomatous Polyp Prevention (APPROVe).

21  ## VIGOR

22  53.    In 2000, The FDA Medical Officer Review of CLASS specifically

23  noted the VIGOR trial and the concern over serious adverse cardiovascular events.[26]

24  54.    According to VIGOR (near acronym for Vioxx Gastrointestinal

25  Outcomes Research) Vioxx patients experienced 20% more serious clinical adverse

26

27  [23] FDA CLASS Review at 74.

[24] *Public Citizen*, January 26, 2005, Dr. Sidney M. Wolfe.

28  [25] *Id.*

[26] FDA CLASS Review at 78.

- 14 -                                                        COMPLAINT

events (statistically significant); they experienced 4.6 times more hypertension events serious enough to warrant discontinuation, 1.7 times more edema events, and 1.85 times as many congestive heart failure adverse events. By two measures of cardiovascular events related to blood clots, Vioxx had twice the risk of naproxen and the results were considered statistically significant.

55. The VIGOR study comprised the most definitive scientific evidence ever obtained about pharmaceutical products. It was a large, randomized clinical trial, the gold standard of medical research. It was a safety study with endpoints set in advance. As Merck stated many times, it was designed to provide definite proof of safety, convincing enough to silence the most skeptical critics. In medical terms, the VIGOR results raised the question of whether selective inhibition of COX-2 was a monumental mistake from the start. While the NSAID risks to the GI system were real and sometimes fatal, they were dwarfed by the cardiovascular risks of the arthritis population that needed these drugs on a daily basis. All makers of NSAIDs, including Defendants, were aware of these results.

## APPROVe

56. Anxious to put safety questions surrounding Vioxx to rest, Merck designed another large scale trial, Adenomatous Polyp Prevention (APPROVe), which was intended to test the drug's ability to prevent or shrink colon polyps, but would also compare the cardiovascular safety of Vioxx to a placebo control. According to the analysis conducted by Public Citizen of the APPROVe data: Vioxx "doubled the risk of any thrombotic cardiovascular event" and "doubled the risk of MI (myocardial infarction a/k/a heart attack)[27]. Although Merck claims that the two-fold risk of heart attacks and strokes seen in the APPROVe trial did not emerge until after patients had been taking the drug for 18 months, closer analysis indicates that significant increase in risk of heart attack was evident in as little as 4 months time. Despite the available CELEBREX data and other information related to Vioxx, PFIZER never paused to reevaluate the CELEBREX data and studies.

[27] *Public Citizen, January 24, 2005, at 15.*

- 15 -                                                    COMPLAINT

· 1

2

3

4

5

57.    The scientific data available during and after CELEBREX's approval process made clear to Defendants that their formulation of CELEBREX would cause a higher risk of blood clots, stroke and/or myocardial infarctions among CELEBREX consumers, alerting them to the need to do additional and adequate safety studies.

6

7

8

9

10

11

12

58.    As stated by Dr. Topol on October 21, 2004, in *The New England Journal of Medicine*, outlining Defendants' failure to have conducted the necessary trials before marketing to humans "it is mandatory to conduct a trial specifically assessing cardiovascular risk and benefit of (COX-2 inhibitors). Such a trial needed to be conducted in patients with established coronary artery disease, who frequently have coexisting osteoarthritis requiring medication and have the highest risk of further cardiovascular events."

13

14

15

59.    Dr. Topol was also the author on the study published in August 2001 in JAMA (listed above) that reported an increased risk of thrombotic cardiovascular events in persons who used COX-2 inhibitors.

16

17

18

19

60.    Based upon readily available scientific data, Defendants knew, or should have known, that their pre-approval testing of CELEBREX did not adequately represent the cross-section of individuals who were intended consumers and therefore, likely to take CELEBREX. Therefore, Defendants' testing and studies were grossly inadequate.

20

21

22

23

24

25

26

27

61.    Had Defendants done adequate testing prior to approval and market launch, rather than the extremely short duration studies done on the small size patient base that was actually done, the Defendants' scientific data would have revealed significant increases in incidence of strokes and myocardial infarctions among the intended and targeted population of CELEBREX consumers. Adequate testing would have shown that CELEBREX possessed serious side effects. Defendants should have taken appropriate measures to ensure that their defectively designed product would not be placed in the stream of commerce and/or should

28

- 16 -                                                    COMPLAINT

have provided full and proper warnings accurately and fully reflecting the scope and severity of symptoms of those side effects should have been made.

62. In fact, post-market approval data did reveal increased risks of clotting, stroke and myocardial infarction, but Defendants intentionally suppressed this information in order for them to gain significant profits from continued CELEBREX sales.

63. Defendants' failure to conduct adequate testing and/or additional testing prior to market launch was based upon their desire to generate maximum financial gains for themselves and to gain a significant market share in the lucrative multi-billion dollar COX-2 inhibitor market.

64. At the time Defendants manufactured, advertised, and distributed CELEBREX to consumers, Defendants intentionally or recklessly ignored and/or withheld information regarding the increased risks of hypertension, stroke and/or myocardial infarctions because Defendants knew that if such increased risks were disclosed, consumers would not purchase CELEBREX, but instead would purchase other cheaper and safer NSAIDs.

## Facts Regarding Defendants' Marketing And Sale Of CELEBREX

65. Such an ineffective and unreasonably dangerous drug could only be widely prescribed as a result of a tremendous marketing campaign. In addition to being aggressive, the Defendants' marketing campaign was fraudulent and misleading. But for fraudulent and misleading advertising, consumers, including the Plaintiff, would not have purchased CELEBREX, a more costly prescriptive drug, ineffective for its intended purposes.

66. Defendant's marketing was so fraudulent that the FDA issued three Warning Letters to Defendants in October 1999, April 2000, and November 2000, all finding that Defendants were unlawfully making false or misleading statements concerning the safety and/or efficacy of CELEBREX. The November letter cited two direct-to-consumer television advertisements that overstated the efficacy of

- 17 -                                                            COMPLAINT

· 1

2

CELEBREX. The FDA ordered that SEARLE immediately cease distribution of the misleading ads.

3

4

5

6

7

8

67.    On February 2001, the FDA issued a Warning Letter to PHARMACIA stating that promotional activities from marketing CELEBREX were unlawful because they were "false, lacking in fair balance, or otherwise misleading." The FDA found that CELEBREX had been promoted for unapproved uses, in unapproved dosing regiments, and that the marketers had made unsupportable claims that CELEBREX was safer and more effective than other NSAIDs.

9

10

11

12

13

14

15

16

68.    In August 2001, it was revealed that PHARMACIA had misrepresented the results of a post-marketing clinical study of CELEBREX when submitting it for publication. PHARMACIA selectively omitted portions of the data relating to adverse effects. The *Washington Post* reported on August 5, 2001 that, "the study had lasted a year, not six months as . . . thought. Almost all of the ulcer complications that occurred during the second have of the study were in CELEBREX users. When all of the data were considered, most of CELEBREX's apparent safety advantage [as compared to traditional NSAIDs] disappeared."

17

18

19

20

21

22

23

69.    On January 10, 2005 the FDA again issued PFIZER a written reprimand for its promotional activities. The reprimand reads: "These five promotional pieces [3 CELEBREX and 2 BEXTRA] variously: omit material facts ... and make misleading safety, unsubstantiated superiority, and unsubstantiated effectiveness claims." Amid continued frustration with PFIZER's continually misleading marketing strategy and ever surmounting evidence of cardiovascular dangers, the FDA Advisory Panel voted overwhelmingly that the company should never again advertise the drug [CELEBREX]."

24

25

26

70.    At all times relevant herein, Defendants engaged in a marketing campaign with the intent that consumers would perceive CELEBREX as a safer and better drug than its other NSAIDs and, therefore, purchase CELEBREX.

27

28

71.    Defendants widely and successfully marketed CELEBREX throughout the United States by, among other things, conducting promotional campaigns that

- 18 -    COMPLAINT

· 1

2

3

4

5

misrepresented the efficacy of CELEBREX in order to induce a widespread use and consumption. CELEBREX was represented to aid the pain and discomfort of arthritis, osteoarthritis, and related problems. Defendants made misrepresentations by means of media advertisements, and statements contained in sales literature provided to Plaintiff's prescribing physicians.

6

7

8

9

10

11

12

13

14

15

16

17

72.     Despite knowledge of the dangers presented by CELEBREX, Defendants and Defendants' predecessors in interest, through their officers, directors and managing agents for the purpose of increasing sales and enhancing its profits, knowingly and deliberately failed to remedy the known defects of CELEBREX and failed to warn the public, including Plaintiff, of the serious risk of injury occasioned by the defects inherent in CELEBREX. Defendants and their officers, agents and managers intentionally proceeded with the inadequate safety testing, and then the manufacturing, sale and marketing of CELEBREX, knowing that persons would be exposed to serious potential danger, in order to advance their own pecuniary interests. Defendants' conduct was wanton and willful, and displayed a conscious disregard for the safety of the public and particularly of Plaintiffs.

18

19

20

21

22

23

24

25

26

27

73.     In an elaborate and sophisticated manner, Defendants aggressively marketed CELEBREX directly to consumers and medical professionals (including physicians and leading medical scholars) in order to leverage pressure on third party payers, medical care organizations, and large institutional buyers (*e.g.*, hospitals) to include CELEBREX on their formularies. Faced with the increased demand for the drug by consumers and health care professionals that resulted from Defendants' successful advertising and marketing blitz, third party payers were compelled to add CELEBREX to their formularies. Defendants' marketing campaign specifically targeted third party payers, physicians, and consumers, and was designed to convince them of both the therapeutic and economic value of CELEBREX.

28

-19-                                                COMPLAINT

74.    Defendants represented that CELEBREX was similar to ibuprofen and naproxen but was superior because it lacked any of the common gastrointestinal adverse side effects associated with these and other non-steroidal anti-inflammatory drugs ("NSAIDS"). Defendants promoted CELEBREX as a safe and effective alternative that would not have the same deleterious and painful impact on the gut, but that would be just as effective, if not more so, for pain relief.

75.    Yet, CELEBREX possessed dangerous and concealed or undisclosed side effects, including the increased risk of serious cardiovascular events, such as heart attacks, unstable angina, cardiac clotting, deep vein thrombosis, hypertension, and cerebrovascular events, such as strokes. In addition, CELEBREX, which is significantly more expensive than traditional NSAIDs[28], was actually was no more effective than traditional and less expensive NSAIDs and, just like traditional NSAIDs, carried a risk of perforations, ulcers, and gastrointestinal bleeding. Yet, Defendants chose not to warn about these risks and dangers.

76.    Defendants knew of these risks before the U.S. Food and Drug Administration (the "FDA") approved CELEBREX for sale, but Defendants ignored, downplayed, suppressed, omitted, and concealed these serious safety risks and denied inefficacy in its promotion, advertising, marketing, and sale of CELEBREX. Defendants' omission, suppression, and concealment of this important information enabled CELEBREX to be sold to, and purchased, or paid for by, the Consumers at a grossly inflated price.

77.    Consequently, CELEBREX captured a large market share of anti-inflammatory drugs prescribed for and used by patients. In 2004 alone, sales of CELEBREX exceeded $2 billion, despite the significantly higher cost of CELEBREX as compared to other pain relievers in the same family of drugs.

78.    Because Defendants engaged in a promotional and marketing campaign that featured an advertising blitz directly targeted to consumers, that touted CELEBREX as a safer drug than other drugs in its class, while uniformly

---

[28] The cost of Celebrex is at least $3-$6 per day, while an over-the-counter NSAID can cost $.50 or less per day.

COMPLAINT

1   failing to disclose the health risks of CELEBREX, Defendants were able to justify

2   pricing CELEBREX significantly higher than the cost of generic aspirin. In reality,

3   that price inflation was not justified. Had Defendants disclosed the truth about

4   CELEBREX, Defendants would not and could not have reaped the billions of

5   dollars in CELEBREX sales that were achieved as a direct result of the

6   concealment, omission, suppression, and obfuscation of the truth.

7       79.    The Defendants intentionally, deliberately, knowingly, and actively

8   concealed, omitted, suppressed, and obfuscated important and material information

9   regarding the risks, dangers, defects, and disadvantages of CELEBREX from

10  Plaintiffs, the public, the medical community, and the regulators. This concealment

11  and omission was deliberate, knowing, active, and uniform, was intended to induce

12  and maximize sales and purchases of CELEBREX, and prevented Plaintiffs from

13  obtaining all the material information that would be important to her decision as a

14  reasonable person to purchase, pay for, and/or use CELEBREX.

15      80.    Defendants' systematic, active, knowing, deliberate, and uniform

16  concealment, omissions, suppression, and conduct caused Plaintiff to purchase, pay

17  for, and/or use CELEBREX; and caused Plaintiffs' losses and damages as asserted

    herein.

18      81.    Had Defendants done adequate testing prior to approval and "market

19  launch," the defendants' scientific data would have revealed significant increases in

20  stroke and myocardial infarction amongst the intended population of CELEBREX

21  consumers. Adequate testing would have shown that CELEBREX possessed

22  serious side effects. Defendants should have taken appropriate measures to ensure

23  that their defectively designed product would not be placed in the stream of

24  commerce and/or should have provided full and proper warnings accurately and

25  fully reflecting the scope and severity of symptoms of those side effects should

26  have been made.

27      82.    In fact, post-market approval data did reveal increased risks of

28  clotting, stroke and myocardial infarction, but Defendants intentionally suppressed

                                    - 21 -                            COMPLAINT

this information in order for them to gain significant profits from continued CELEBREX sales.

83. Defendants' failure to conduct adequate testing and/or additional testing prior to "market launch," and active concealment and failure to warn the medical community and general public of the known cardiovascular risks of CELEBREX was particularly negligent, reckless and/or malicious given the drug's known target market. Defendants were well aware that most patients taking CELEBREX are elderly and have higher risk of developing cardiovascular risks to begin with. Nearly half of the patients with arthritis have coexisting cardiovascular disease, and most patients, as discovered in the CLASS study, were prone to higher dosing.

84. Defendants' failure to conduct adequate testing and/or additional testing prior to "market launch" was based upon their desire to generate maximum financial gains for themselves and to gain a significant market share in the lucrative multi-billion dollar COX-2 inhibitor market.

85. At the time Defendants manufactured, advertising, and distributed CELEBREX to consumers including Plaintiffs, Defendants intentionally or recklessly ignored and/or withheld information regarding the increased risks of hypertension, stroke and/or myocardial infarctions because Defendants knew that if such increased risks were disclosed, consumers would not purchase CELEBREX, but instead would purchase other cheaper and safer NSAID drugs.

## FACTUAL ALLEGATIONS REGARDING BEXTRA

86. BEXTRA (generically known as Valdecoxib) is second generation among the vaunted class of drugs called COX-2 inhibitors, which are touted as anti-inflammatory agents that cause less gastrointestinal damage than older, standby pain relievers like aspirin or ibuprofen. However, not only are their gastrointestinal benefits insignificant, they elevate the risk of heart attack. BEXTRA has a higher

- 22 -                                                        COMPLAINT

level of COX-2 inhibition than its predecessor at Searle, Celebrex, and is substantially similar in inhibition levels to Merck & Co., Inc.'s drug, Vioxx®.

87. The Food and Drug Administration approved BEXTRA on November 19, 2001 for the treatment of management of acute pain in adults, and for relief of the signs and symptoms of osteoarthritis and rheumatoid arthritis. Subsequent to FDA approval, BEXTRA was widely advertised and marketed by Defendants as a safe and effective pain relief medication.

88. BEXTRA is a member of a class of drugs known as "NSAIDs" (non-steroidal anti-inflammatory drug), but more specifically contains cyclooxygenase 2 ("COX-2") inhibitory properties. Generally, NSAIDs prevent the formation of fatty acid cyclooxygenases, of which there are two known types ("COX-1" and "COX-2"). BEXTRA is generally different than NSAIDs in that it is solely a COX-2 inhibitor. The rationale being that if the COX-1 enzyme is unaltered, the patient will experience fewer gastrointestinal complications commonly associated with NSAIDs. Further, the inhibition of COX-2 enzymes is said to decrease pain and inflammation.

89. In addition to the aforementioned, BEXTRA has been linked to several severe and life threatening medical disorders including, but not limited to, edema, changes in blood pressure, clotting, heart attack, stroke, seizures, kidney and liver damage, pregnancy complications, Stevens Johnson Syndrome and death. These known material risks were not disclosed to or shared with Plaintiff by Defendants.

90. Defendants' strategy during the pre-market approval process has been to aggressively market and sell its products by falsely misleading potential users about the products and by failing to protect users from serious dangers that Defendants knew or should have known to result from use of these products.

91. Defendants widely and successfully marketed BEXTRA in the United States, by undertaking an advertising blitz extolling the virtues of BEXTRA in order to induce widespread use of the products. The marketing campaign consisted of advertisements, promotional literature to be placed in the offices of doctors and

- 23 -                                                      COMPLAINT

· 1

2

other health care providers, and other promotional materials provided to potential BEXTRA users.

3

4

5

6

7

8

92.    The advertising program, as a whole, sought to create the image, impression and belief by consumers and physicians that the use of BEXTRA was safe for human use, had fewer side effects and adverse reactions than other pain relief medications and would not interfere with daily life, even though Defendants knew these to be false, and even though the Defendants had no reasonable grounds to believe them to be true.

9

10

11

12

13

14

15

16

93.    Defendants purposefully downplayed and understated the health hazards and risks associated with BEXTRA. Defendants, through promotional literature, audio conferences, professional meetings, and press releases deceived potential users of BEXTRA by relaying positive information, including testimonials from satisfied users, and manipulating statistics to suggest widespread acceptability, while downplaying the known adverse and serious health effects. Defendants concealed material relevant information from potential BEXTRA users and minimized user and prescriber concerns regarding the safety of BEXTRA.

17

18

19

94.    In particular, in the materials produced by Defendants, Defendants falsely misrepresented the severity, frequency and nature of adverse health effects caused by BEXTRA, and falsely represented that adequate testing had been conducted concerning BEXTRA.

20

21

22

23

24

25

26

27

28

95.    Searle and its agents and/or representatives misrepresented claims regarding the efficacy of BEXTRA. In June 2003 Defendants completed a study that showed highly elevated risk for clotting, stroke and myocardial infarctions and had data from a second study by August 2004. The Defendants downplayed the significance of the negative cardiovascular thrombotic events in the studies as inconclusive as the studies were not long-term prospective randomized placebo controlled studies. According to Dr. Erick Topol, the need to conduct such long term studies prior to marketing this drug to humans was deemed "mandatory" and the patient population must include patients with both established cardiovascular

- 24 -

1    artery disease and osteoarthritis as this group has the highest risk of further

2    cardiovascular complication. [29] Studies by Dr. Topol [30] and Dr. Garrett Fitzgerald [31]

3    as early as 1999 showed that the inhibited platelet aggregation properties of Cox-2

4    inhibitors manifest itself in an increased risk of strokes and myocardial infarction.

5        96.    Defendants' product promotion failed to present serious and

6    significant risks associated with BEXTRA therapy for the intended population

7    expected to take BEXTRA, which could and did result in increased risks of

8    clotting, stroke and myocardial infarction.

9        97.    As a result of the Defendants' advertising and marketing efforts, and

10   representations concerning the subject products, BEXTRA was and continued to be

11   pervasively prescribed throughout the United States, until it was voluntarily

12   withdrawn from the market in April of 2005.

13       98.    If Plaintiffs had known the risks and dangers associated with

14   BEXTRA, Plaintiffs would not have taken BEXTRA and consequentially would

15   not have been subject to its serious side effects.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

## Negligence

## (Against All Defendants)

19       99.    Plaintiffs incorporate by reference all of the paragraphs of this

20   Complaint as if fully set forth herein.

21       100.   Defendants owed Plaintiffs a duty to exercise reasonable care when

22   designing, manufacturing, marketing, advertising, distributing, and selling

23   CELEBREX and BEXTRA. This duty included the duty not to introduce

24   pharmaceutical drugs, such as CELEBREX and BEXTRA, into the stream of

27   [29] *The New England Journal of Medicine*, October 21, 2004.

28   [30] *Journal of the American Medical Association*, August 2001.
     [31] *The New England Journal of Medicine*, October 21, 2004.

1  commerce that caused users to suffer from unreasonable, dangerous or untoward
2  adverse side effects.

3      101.  At all relevant times to this action, Defendants owed a duty to properly
4  warn Plaintiffs and the Public of the risks, dangers and adverse side effects of their
5  pharmaceutical drugs CELEBREX and BEXTRA.

6      102.  Defendants breached their duties by failing to exercise ordinary care in
7  the preparation, design, research, testing, development, manufacturing, inspection,
8  labeling, marketing, promotion, advertising and selling of CELEBREX and
9  BEXTRA, including:

10          (a)    failing to use due care in the preparation and development of
11          CELEBREX and BEXTRA to prevent the aforementioned risk of
12          injuries to individuals when the drugs were ingested;

13          (b)    failing to use due care in the design of CELEBREX and
14          BEXTRA to prevent the aforementioned risk of injuries to individuals
15          when the drugs were ingested;

16          (c)    failing to conduct adequate pre-clinical testing and research to
17          determine the safety of CELEBREX and BEXTRA;

18          (d)    failing to conduct adequate post-marketing surveillance and
19          exposure studies to determine the safety of CELEBREX and
20          BEXTRA;

21          (e)    failing to completely, accurately and in a timely fashion,
22          disclose the results of the pre-marketing testing and post-marketing
23          surveillance and testing to Plaintiffs, consumers, the medical
24          community, and the FDA;

25          (f)    failing to accompany CELEBREX and BEXTRA with proper
26          warnings regarding all possible adverse side effects associated with the
27          use of CELEBREX and BEXTRA;

28          (g)    failing to use due care in the manufacture, inspection, and

- 26 -                                    COMPLAINT

labeling of CELEBREX and BEXTRA to prevent the aforementioned

risk of injuries to individuals who used CELEBREX and/or BEXTRA;

(h)    failing to use due care in the promotion of CELEBREX and

BEXTRA to prevent the aforementioned risk of injuries to individuals

when the drugs were ingested;

(i)    failing to use due care in the sale and marketing of CELEBREX

and BEXTRA to prevent the aforementioned risk of injuries to

individuals when the drugs were ingested;

(j)    failing to use due care in the selling of CELEBREX and

BEXTRA to prevent the aforementioned risk of injuries to individuals

when the drugs were ingested;

(k)    failing to provide adequate and accurate training and

information to the sales representatives who sold CELEBREX and

BEXTRA;

(l)    failing to provide adequate and accurate training and

information to healthcare providers for the appropriate use of

CELEBREX and BEXTRA; and

(m)    being otherwise reckless, careless and/or negligent.

103.    Despite the fact that Defendants knew or should have known that

CELEBREX and BEXTRA caused unreasonable and dangerous side effects which

many users would be unable to remedy by any means, Defendants continued to

promote and market CELEBREX and BEXTRA to consumers, including Plaintiffs,

when safer and more effective methods of pain relief were available.

104.    Defendants were, or should have been had they exercised reasonable

care, in possession of evidence demonstrating that CELEBREX and BEXTRA

caused serious side effects. Nevertheless, they continued to market their products

by providing false and misleading information with regard to the safety and

efficacy of CELEBREX and BEXTRA.

- 27 -

105.   Defendants knew or should have known that consumers such as Plaintiffs would foreseeably suffer injuries as a result of their failure to exercise ordinary care as described above.

106.   As a direct and proximate consequence of Defendants' acts, omissions, and misrepresentations described herein, the Plaintiffs, sustained serious cardiovascular injuries; have required and/or will require healthcare and services; have incurred and will continue to incur medical and related expenses; have suffered loss of wages and a diminished capacity to earn wages in the future; have suffered and will continue to suffer mental anguish, diminished capacity for the enjoyment of life, a diminished quality of life, increased risk of premature death, aggravation of preexisting conditions and activation of latent conditions, and other such damages.  Plaintiffs' direct medical losses and costs include care for hospitalization, physician care, monitoring, treatment, medications, and supplies. Plaintiffs will continue to incur such losses in the future.

107.   Defendants' conduct was committed with knowing, conscious, wanton, willful, and deliberate disregard for the value of human life and the rights and safety of consumers, including Plaintiffs, thereby entitling Plaintiffs to punitive and exemplary damages so as to punish Defendants and deter them from similar conduct in the future.

108.   WHEREFORE, Plaintiffs demand judgment against Defendants and seek compensatory damages, and exemplary and punitive damages together with interest, the costs of suit and attorneys' fees and such other and further relief as this Court deems just and proper.

## SECOND CLAIM FOR RELIEF

### Strict Liability

### (Against All Defendants)

109.   Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein and further alleged as follows:

-28-                                                    COMPLAINT

1    110.   At all times relevant to this action, Defendants were suppliers of

2   CELEBREX and BEXTRA, placing the drug into the stream of commerce.

3   CELEBREX and BEXTRA were expected to and did reach Plaintiffs without

4   substantial change in the condition in which it was manufactured and sold.

5    111.   CELEBREX and BEXTRA were unsafe for normal or reasonably

6   anticipated use.

7    112.   CELEBREX and BEXTRA were defective in design or formulation

8   because when it left the hands of the manufacturer and/or supplier, they were

9   unreasonably dangerous and more dangerous than an ordinary consumer would

10  expect. CELEBREX and BEXTRA were also defective and unreasonably

11  dangerous in that the foreseeable risk of injuries from CELEBREX and BEXTRA

12  exceeded the benefits associated with the design and/or formulation of the products.

13   113.   CELEBREX and BEXTRA are unreasonably dangerous: (a) in

14  construction or composition; (b) in design; (c) because an adequate warning about

15  the products was not provided; (d) because they do not conform to an express

16  warranty of the manufacturer about the products.

17   114.   CELEBREX and BEXTRA as manufactured and supplied by

18  Defendants were also defective due to inadequate warnings, and/or inadequate

19  clinical trials, testing and study, and inadequate reporting regarding the results of

20  the clinical trials, testing and study. Defendants failed to perform adequate testing

21  before exposing Plaintiffs to the medication, testing which would have shown that

22  CELEBREX and BEXTRA had the potential to cause serious side effects including

     the injuries suffered like the Plaintiffs.

23   115.   CELEBREX and BEXTRA as manufactured and supplied by

24  Defendants were defective due to inadequate post-marketing warnings or

25  instructions because, after Defendants knew or should have known of the risk of

26  injuries from CELEBREX and BEXTRA, they failed to provide adequate warnings

27  to the medical community and the consumers, to whom they were directly

28

- 29 -                                                    COMPLAINT

marketing and advertising CELEBREX and BEXTRA; and, further, it continued to affirmatively promote CELEBREX and BEXTRA as safe and effective.

116.    CELEBREX and BEXTRA were manufactured, distributed, tested, sold, marketed, advertised and promoted defectively by Defendants, and as a direct and proximate cause of Defendants' defective designs of CELEBREX and BEXTRA, Plaintiffs used CELEBREX and/or BEXTRA rather than other safer and cheaper NSAIDs.  As a result, Plaintiffs suffered the personal injuries described herein.

117.    Information given by Defendants to the medical community and to the consumers concerning the safety and efficacy of CELEBREX and BEXTRA, especially the information contained in the advertising and promotional materials did not accurately reflect the potential side effects of CELEBREX and BEXTRA.

118.    Had adequate warnings and instructions been provided, Plaintiffs would not have taken CELEBREX and/or BEXTRA, and would not have been at risk of the harmful side effects described herein.

119.    Defendants acted with conscious and deliberate disregard of the foreseeable harm caused by CELEBREX and BEXTRA.

120.    Plaintiffs could not, through the exercise of reasonable care, have discovered CELEBREX and BEXTRA's defects or perceived the dangers posed by the drug.

121.    As a direct and proximate consequence of Defendants' acts, omissions, and misrepresentations described herein,  Plaintiffs, sustained serious cardiovascular injuries; have required and will require healthcare and services; has incurred and will continue to incur medical and related expenses; have suffered loss of wages and a diminished capacity to earn wages in the future; have suffered and will continue to suffer mental anguish, diminished capacity for the enjoyment of life, a diminished quality of life, increased risk of premature death, aggravation of preexisting conditions and activation of latent conditions, and other such damages. Plaintiffs' direct medical losses and costs include care for hospitalization, physician

care, monitoring, treatment, medications, and supplies. Plaintiffs will continue to incur such losses in the future.

122. Defendants' conduct was committed with knowing, conscious, wanton, willful, and deliberate disregard for the value of human life and the rights and safety of consumers, including Plaintiffs, thereby entitling Plaintiffs to punitive and exemplary damages so as to punish Defendants and deter them from similar conduct in the future.

123. WHEREFORE, Plaintiffs demand judgment against Defendants and seeks compensatory damages, and punitive and exemplary damages together with interest, the costs of suit and attorneys' fees and such other and further relief as this Court deems just and proper.

**THIRD CLAIM FOR RELIEF**

**<u>Breach of Express Warranty</u>**

**<u>(Against All Defendants)</u>**

124. Plaintiffs incorporate by reference all of the paragraphs of this Complaint as if fully set forth herein.

125. Defendants expressly represented to Plaintiffs and other consumers and the medical community that CELEBREX and BEXTRA were safe and fit for their intended purposes, that they were of merchantable quality, that they did not produce any dangerous side effects, particularly any unwarned-of side effects, and that they were adequately tested.

126. These warranties came in the form of:

127. Defendants' public written and verbal assurances of the safety and efficacy of CELEBREX and BEXTRA;

128. Press releases, interviews and dissemination via the media of promotional information, the sole purpose of which was to create an increased demand for CELEBREX and BEXTRA, which failed to warn of the risk of injuries inherent to the ingestion of CELEBREX and/or BEXTRA, especially to the long-term ingestion of CELEBREX and/or BEXTRA;

1    129.    Verbal and written assurances made by Defendants regarding

2    CELEBREX and BEXTRA and downplaying the risk of injuries associated with

3    the drugs;

4    130.    False and misleading written information, supplied by Defendants, and

5    published in the Physician's Desk Reference on an annual basis, upon which

6    physicians relied in prescribing CELEBREX and BEXTRA during the period of

7    Plaintiffs' ingestion of CELEBREX and BEXTRA, and;

8    131.    Advertisements.

9    132.    The documents referred to above were created by and at the direction

10   of Defendants.

11   133.    Defendants knew or had reason to know that CELEBREX and

12   BEXTRA did not conform to these express representations in that CELEBREX and

13   BEXTRA are neither as safe nor as effective as represented, and that CELEBREX

14   and BEXTRA produce serious adverse side effects.

15   134.    CELEBREX and BEXTRA did not and do not conform to Defendants'

16   express representations because it is not safe, has numerous and serious side effects,

     including unwarned-of side effects, and causes severe and permanent injuries.

17   135.    Plaintiffs, other consumers, and the medical community relied upon

18   Defendants' express warranties.

19   136.    As a direct and proximate consequence of Defendants' acts, omissions,

20   and misrepresentations described herein, the Plaintiffs, sustained serious

21   cardiovascular injuries; have required and will require healthcare and services; have

22   incurred and will continue to incur medical and related expenses; have suffered loss

23   of wages and a diminished capacity to earn wages in the future; have suffered and

24   will continue to suffer mental anguish, diminished capacity for the enjoyment of

25   life, a diminished quality of life, increased risk of premature death, aggravation of

26   preexisting conditions and activation of latent conditions, and other such damages.

27   Plaintiffs' direct medical losses and costs include care for hospitalization, physician

28

-32-                                                    COMPLAINT

1    care, monitoring, treatment, medications, and supplies. Plaintiffs will continue to

2    incur such losses in the future.

3       137.  Defendants' conduct was committed with knowing, conscious,

4    wanton, willful, and deliberate disregard for the value of human life and the rights

5    and safety of consumers, including Plaintiffs, thereby entitling Plaintiffs to punitive

6    and exemplary damages so as to punish Defendants and deter them from similar

7    conduct in the future.

8       138.  WHEREFORE, Plaintiffs demand judgment against Defendants and

9    seek compensatory damages, and punitive and exemplary damages together with

10   interest, the costs of suit and attorneys' fees and such other and further relief as this

11   Court deems just and proper.

## FOURTH CLAIM FOR RELIEF

### Breach of Implied Warranty

### (Against All Defendants)

139.  Plaintiffs incorporate by reference all of the paragraphs of this
Complaint as if fully set forth herein.

140.  Defendants manufactured, distributed, advertised, promoted, and sold
CELEBREX and BEXTRA.

141.  At all relevant times, Defendants knew of the use for which
CELEBREX and BEXTRA were intended and impliedly warranted the product to
be of merchantable quality and safe and fit for such use.

142.  CELEBREX and BEXTRA were not of merchantable quality and were
not fit for their intended use, because they cause increased risk of serious
cardiovascular and cerebrovascular adverse events, including heart attacks, strokes
and other serious and harmful adverse health effects.

143.  Defendants breached the implied warranty that CELEBREX and
BEXTRA were of merchantable quality and fit for such use in violation of Md.
Code Ann., Com. Law § 2-314, *et seq*.

- 33 -                                    COMPLAINT

144.   Defendants were aware that consumers, including Plaintiffs, would use CELEBREX and/or BEXTRA for treatment of pain and inflammation and for other purposes.

145.   Plaintiffs and the medical community reasonably relied upon Defendants' judgment and expertise to only sell them or allow them to prescribe CELEBREX and/or BEXTRA only if it was indeed of merchantable quality and safe and fit for its intended use.  Consumers, including Plaintiffs, and the medical community, reasonably relied upon Defendants' implied warranty for CELEBREX and BEXTRA.

146.   CELEBREX and BEXTRA reached consumers, including Plaintiffs, without substantial change in the condition in which they were manufactured and sold by Defendants.

147.   Defendants breached their implied warranty to consumers, including Plaintiffs; CELEBREX and BEXTRA were not of merchantable quality or safe and fit for their intended use.

148.   As a direct and proximate consequence of Defendants' acts, omissions, and misrepresentations described herein, the Plaintiffs, sustained serious cardiovascular injuries; have required and will require healthcare and services; have incurred and will continue to incur medical and related expenses; has suffered loss of wages and a diminished capacity to earn wages in the future; have suffered and will continue to suffer mental anguish, diminished capacity for the enjoyment of life, a diminished quality of life, increased risk of premature death, aggravation of preexisting conditions and activation of latent conditions, and other such damages. Plaintiffs' direct medical losses and costs include care for hospitalization, physician care, monitoring, treatment, medications, and supplies.  Plaintiffs will continue to incur such losses in the future.

149.   Defendants' conduct was committed with knowing, conscious, wanton, willful, and deliberate disregard for the value of human life and the rights and safety of consumers, including Plaintiffs, thereby entitling Plaintiffs to punitive

and exemplary damages so as to punish Defendants and deter them from similar
conduct in the future.

150.   WHEREFORE, Plaintiffs demand judgment against Defendants and
seeks compensatory damages and punitive and exemplary damages together with
interest, the costs of suit and attorneys' fees, and such other and further relief as this
Court deems just and proper.

**FIFTH CLAIM FOR RELIEF**

**<u>Fraudulent Misrepresentation & Concealment</u>**

**<u>(Against All Defendants)</u>**

151.   Plaintiffs incorporate by reference all of the paragraphs of this
Complaint as if fully set forth herein.

152.   Defendants' superior knowledge and expertise, their relationship of
trust and confidence with doctors and the public, their specific knowledge regarding
the risks and dangers of CELEBREX and BEXTRA, and their intentional
dissemination of promotional and marketing information about CELEBREX and
BEXTRA for the purpose of maximizing their sales, each gave rise to the
affirmative duty to meaningfully disclose and provide all material information
about CELEBREX and BEXTRA's risks and harms to doctors and consumers.

153.   Defendants made fraudulent affirmative misrepresentations with
respect to CELEBREX and BEXTRA in the following particulars:

154.   Defendants represented through their labeling, advertising, marketing
materials, detail persons, seminar presentations, publications, notice letters, and
regulatory submissions that CELEBREX and BEXTRA had been tested and found
to be safe and effective for the treatment of pain and inflammation; and

155.   Defendants represented that CELEBREX and BEXTRA were safer
than other alternative medications.

156.   Defendants made affirmative misrepresentations; and fraudulently,
intentionally and/or recklessly concealed material adverse information regarding
the safety and effectiveness of CELEBREX and BEXTRA.

COMPLAINT

157. Defendants made these misrepresentations and actively concealed adverse information at a time when Defendants knew or had reason to know that CELEBREX and BEXTRA had defects and were unreasonably dangerous and were not what Defendants had represented to the medical community, the FDA and the consuming public, including Plaintiffs.

158. Defendants omitted, suppressed and/or concealed material facts concerning the dangers and risk of injuries associated with the use of CELEBREX and BEXTRA including, but not limited to, the cardiovascular, cerebrovascular, and other serious health risks. Furthermore, Defendants' purpose was willfully blind to, ignored, downplayed, avoided, and/or otherwise understated the serious nature of the risks associated with the use of CELEBREX and/or BEXTRA in order to increase their sales.

159. The representations and concealment were undertaken by Defendants with an intent that doctors and patients, including Plaintiffs, rely upon them.

160. Defendants' representations and concealments were undertaken with the intent of defrauding and deceiving Plaintiffs, other consumers, and the medical community to induce and encourage the sales of CELEBREX and BEXTRA.

161. Defendants' fraudulent representations evinced their callous, reckless, willful, and depraved indifference to the health, safety, and welfare of consumers, including Plaintiffs.

162. Plaintiffs' physicians and Plaintiffs relied on and were induced by Defendants' misrepresentations, omissions, and/or active concealment of the dangers of CELEBREX and BEXTRA in selecting CELEBREX and/or BEXTRA treatment.

163. Plaintiffs and the treating medical community did not know that the representations were false and were justified in relying upon Defendants' representations.

164. Had Plaintiffs been aware of the increased risk of side effects associated with CELEBREX and BEXTRA and the relative efficacy of

1
2

CELEBREX and BEXTRA compared with other readily available medications, Plaintiffs would not have taken CELEBREX and/or BEXTRA as they did.

3
4
5
6
7
8
9
10
11
12
13

165.   As a direct and proximate consequence of Defendants' acts, omissions, and misrepresentations described herein, the Plaintiffs, sustained serious cardiovascular injuries; have required and will require healthcare and services; have incurred and will continue to incur medical and related expenses; have suffered loss of wages and a diminished capacity to earn wages in the future; have suffered and will continue to suffer mental anguish, diminished capacity for the enjoyment of life, a diminished quality of life, increased risk of premature death, aggravation of preexisting conditions and activation of latent conditions, and other such damages. Plaintiffs' direct medical losses and costs include care for hospitalization, physician care, monitoring, treatment, medications, and supplies.  Plaintiffs will continue to incur such losses in the future.

14
15
16
17

166.   Defendants' conduct was committed with knowing, conscious, wanton, willful, and deliberate disregard for the value of human life and the rights and safety of consumers, including Plaintiffs, thereby entitling Plaintiffs to punitive and exemplary damages so as to punish Defendants and deter them from similar conduct in the future.

18
19
20
21

167.         WHEREFORE, Plaintiffs demand judgment against Defendants and seek compensatory damages, and punitive and exemplary damages together with interest, the costs of suit and attorneys' fees, and such other and further relief as this Court deems just and proper.

22

## SIXTH CLAIM FOR RELIEF

23

## Unjust Enrichment

24

## (Against All Defendants)

25
26

168.   Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein.

27
28

169.   At all times relevant to this action, Defendants were the manufacturers, sellers, and/or suppliers of CELEBREX and BEXTRA.

- 37 -                                                                COMPLAINT

170. Plaintiffs paid for CELEBREX and/or BEXTRA for the purpose of managing their pain safely and effectively.

171. Defendants have accepted payment from Plaintiffs for the purchase of CELEBREX and/or BEXTRA.

172. Plaintiffs did not receive the safe and effective pharmaceutical product for which they paid.

173. It is inequitable and unjust for Defendants to retain this money because the Plaintiffs did not in fact receive the product Defendant represented CELEBREX and BEXTRA to be.

174. WHEREFORE, Plaintiffs demand judgment against Defendants and seeks equitable relief, the costs of suit and attorneys' fees, and such other and further relief as this Court deems just and proper.

## SEVENTH CLAIM FOR RELIEF

## Violations of State Consumer Fraud and Deceptive Trade Practices Acts

## (Against All Defendants)

175. Plaintiffs incorporate by reference the preceding paragraphs as if they were fully set forth herein.

176. Defendants had a statutory duty to refrain from unfair or deceptive acts or practices in the sale and promotion of CELEBREX and/or BEXTRA to Plaintiffs.

177. Defendants engaged in unfair, unconscionable, deceptive, fraudulent and misleading acts or practices in violation of all California consumer protection laws, identified below. Through its false, untrue and misleading promotions of CELEBREX and BEXTRA, Defendants induced Plaintiffs to purchase and/or pay for the purchase of CELEBREX and/or BEXTRA. Defendants misrepresented the alleged benefits and characteristics of CELEBREX and BEXTRA; suppressed, concealed and failed to disclose material information concerning known adverse effects of CELEBREX and BEXTRA; misrepresented the quality of CELEBREX and BEXTRA as compared to much lower-cost alternatives; misrepresented and

COMPLAINT

1

advertised that CELEBREX and BEXTRA were of a particular standard, quality or

2

grade that it was not; misrepresented CELEBREX and BEXTRA in such a manner

3

that later, on disclosure of the true facts, there was a likelihood that Plaintiffs would

4

have switched from CELEBREX and/or BEXTRA to another NSAID and/or

5

chosen not to purchase and/or reimburse for purchases of CELEBREX and/or

6

BEXTRA; advertised CELEBREX and BEXTRA with the intent not to sell them as

7

advertised; and otherwise engaged in fraudulent and deceptive conduct.

8

178.    Defendants' conduct created a likelihood of, and in fact caused,

9

confusion and misunderstanding. Defendants' conduct misled, deceived and

10

damaged Plaintiffs and Defendants' fraudulent, misleading and deceptive conduct

11

was perpetrated with an intent that Plaintiffs rely on said conduct by purchasing

12

and/or paying for purchases of CELEBREX and/or BEXTRA. Moreover,

13

Defendants knowingly took advantage of Plaintiffs who were reasonably unable to

14

protect their interests due to ignorance of the harmful adverse effects of

15

CELEBREX and BEXTRA. Defendants' conduct was willful, outrageous,

16

immoral, unethical, oppressive, unscrupulous, unconscionable and substantially

injurious to Plaintiffs and offends the public conscience.

17

18

179.    Plaintiffs purchased primarily for personal, family or household

purposes.

19

20

180.    As a result of Defendants' violative conduct, Plaintiffs purchased

and/or paid for purchases of CELEBREX and/or BEXTRA that were not made for

21

resale.

22

181.    Defendants engaged in unfair competition or deceptive acts or

23

practices in violation of HRS § 480-2, *et seq.*, among others.

24

182.    As a proximate result of Defendants' misrepresentations and

25

omissions, Plaintiff and Plaintiff have suffered ascertainable losses, in an amount to

26

be determined at trial.

27

183.    Throughout the period described in this Complaint, Defendants

28

repeatedly engaged in intentional misconduct characterized by trickery, deceit and a

- 39 -                                    COMPLAINT

wanton, willful, conscious and reckless disregard of the health, rights and interests of the Plaintiffs, and, in so conducting itself, acted with oppression, fraud, and malice toward the Plaintiff. As a result of Defendants' indifference to and reckless disregard of the health and safety of CELEBREX and BEXTRA patients, they suffered both physical and economic harm, and all end-payors incurred economic damages. Accordingly, Defendants' conduct was highly reprehensible under controlling Supreme Court punitive damages authority, and Plaintiffs are entitled to punitive and/or exemplary damages.

184. As a direct and proximate consequence of Defendants' acts, omissions, and misrepresentations described herein, the Plaintiffs, sustained serious cardiovascular injuries; have required and will require healthcare and services; have incurred and will continue to incur medical and related expenses; have suffered loss of wages and a diminished capacity to earn wages in the future; have suffered and will continue to suffer mental anguish, diminished capacity for the enjoyment of life, a diminished quality of life, increased risk of premature death, aggravation of preexisting conditions and activation of latent conditions, and other such damages. Plaintiffs' direct medical losses and costs include care for hospitalization, physician care, monitoring, treatment, medications, and supplies. Plaintiffs will continue to incur such losses in the future.

185. Defendants' conduct was committed with knowing, conscious, wanton, willful, and deliberate disregard for the value of human life and the rights and safety of consumers, including Plaintiffs, thereby entitling Plaintiffs to punitive and exemplary damages so as to punish Defendants and deter them from similar conduct in the future.

186. WHEREFORE, Plaintiffs demand judgment against Defendants and seek compensatory damages, and punitive and exemplary damages together with interest, the costs of suit and attorneys' fees and such other and further relief as this Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request the following relief:

1.  General damages in excess of the jurisdictional amount of this Court;

2.  Consequential damages;

3.  Disgorgement of profits;

4.  Restitution;

5.  Punitive and exemplary damages;

6.  Pre-judgment and post-judgment interest as provided by law;

7.  Recovery of Plaintiffs' costs including, but not limited to, discretionary Court costs of these causes, and those costs available under the law, as well as expert fees and attorneys' fees and expenses, and costs of this action; and

8.  Such other and further relief as the Court deems just and proper.

Dated:      April 3, 2008          GIRARDI KEESE


                                   By: _____
                                       J. PAUL SIZEMORE
                                       Attorney for Plaintiffs

1

## DEMAND FOR JURY TRIAL

2        Plaintiffs demand a trial by jury on all claims so triable in this action.

3

4     Dated: April 3, 2008                          GIRARDI KEESE

5

6                                          By: _____

7                                               J. PAUL SIZEMORE
                                                Attorney for Plaintiffs
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 42 -                                    COMPLAINT



JS 44 (Rev. 12/07) (cand rev 1-16-08)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON PAGE TWO OF THE FORM.)

## I. (a) PLAINTIFFS
JAMES GRAHAM, individually, BRUCE WORTHINGTON, individually,

## DEFENDANTS
PFIZER, INC., PHARMACIA CORPORATION, and G.D. SEARLE LLC, (FKA G.D. SEARLE & CO.), and DOES 1 through 100,

**(b)** County of Residence of First Listed Plaintiff
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant    New York
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Thomas V. Girardi, SBN 36603; J. Paul Sizemore, SBN 254981
V. Andre Sherman, SBN 198684; Jennifer A. Lenze, SBN 246858
Girardi Keese
1126 Wilshire Boulevard, Los Angeles, CA  90017; (213) 977-0211

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff

☐ 2  U.S. Government Defendant

☐ 3  Federal Question
(U.S. Government Not a Party)

☒ 4  Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                    and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☒ 365 Personal Injury — | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | **LABOR** | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | ☐ 710 Fair Labor Standards | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | Act | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | & Disclosure Act | | ☐ 892 Economic Stabilization Act |
| | | | ☐ 740 Railway Labor Act | | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | ☐ 870 Taxes (U.S. Plaintiff | ☐ 895 Freedom of Information |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | or Defendant) | Act |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party | ☐ 900 Appeal of Fee |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | 26 USC 7609 | Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | **IMMIGRATION** | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | ☐ 462 Naturalization Application | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | ☐ 463 Habeas Corpus – | | ☐ 950 Constitutionality of |
| | Other | | Alien Detainee | | State Statutes |
| | ☐ 440 Other Civil Rights | | ☐ 465 Other Immigration | | |
| | | | Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

☐ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☒ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
Medical device products liability.
Brief description of cause:

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
PLEASE REFER TO CIVIL L.R. 3-12 CONCERNING REQUIREMENT TO FILE
"NOTICE OF RELATED CASE".  Judge Breyer - MDL 1699

## IX. DIVISIONAL ASSIGNMENT (CIVIL L.R. 3-2)
(PLACE AND "X" IN ONE BOX ONLY)
☒ SAN FRANCISCO/OAKLAND    ☐ SAN JOSE

DATE
April 3, 2008

SIGNATURE OF ATTORNEY OF RECORD
J. PAUL SIZEMORE